UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| JAMES L. CAPP | CIVIL ACTION NO. 09-320 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| ELI LILLY AND COMPANY | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Before this Court is a Motion for Summary Judgment [Record Document 47], filed on behalf of the Defendant, Eli Lilly and Company. Plaintiff opposes this motion. See Record Document 55. For the reasons assigned herein, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's claims are **DISMISSED WITH PREJUDICE.**

## FACTUAL BACKGROUND

Eli Lilly and Company ("Eli Lilly") is a global, research-based company that develops, manufactures and sells pharmaceutical products. Eli Lilly hired Plaintiff James L. Capp ("Capp") on September 21, 1973. [Record Document 47, SOMF, ¶ 1-2]. Thereafter, Capp held at least thirteen (13) sales-related positions until his retirement in 2006 at the age of 63. [Record Document 55, SOMF, ¶ 3]. From February 2001 until his retirement in 2006, Capp held the positions of Account Executive and Senior Account Executive in Eli Lilly's Public Health Division. [Record Document 47, SOMF, ¶ 4].

Effective November 1, 2005, Eli Lilly implemented a realignment of its Public Health Division in which it redistributed account executives among four regions. Id. at ¶ 22. After this realignment, Capp joined the new West Central Region, which was managed by Ned "Butch" Benson. Benson, in turn, reported to Tom Assalley, the Director for the Public

Health Division's West Area. Id. at ¶ 24. The new West Central Region included account executives from the former South Central and Midwest regions; Capp was the only account executive assigned to the West Central Region from the former Southeast Region.

After the realignment, Capp was given responsibility for the states of Louisiana and Mississippi. [Record Document 55, SOMF, ¶ 8]. As an account executive, Capp was responsible for gaining and maintaining access, availability, and reimbursement for a portfolio of Eli Lilly products on state government or Medicaid formularies. Account executives were also responsible for achieving certain sales goals for the portfolio of Eli Lilly products in the states to which they were assigned. In 2005 and 2006, Eli Lilly expected all account executives in the Public Heath Division to secure access to its products on state formularies, and evaluated account executives' performance in part based on whether they were able to obtain such access. [Record Document 47, SOMF, ¶ 9-10]. Eli Lilly expected account executives to accomplish these objectives by working with their state action team[1] on account strategies and tactics geared toward gaining access for Eli Lilly's products and reaching Eli Lilly's goals in that state, and by establishing and developing relationships within customer accounts to address customer needs and influence customer decision processes. Id. at ¶ 11.

Eli Lilly delivers annual performance evaluations through what it calls the "Performance Management" ("PM") process, which involves employees meeting with their supervisors at the beginning of the year to set goals and expectations for the year, which

---

[1]The state action team consisted of the account executive, district manager, regional manager, manager of public affairs, and public affairs liaison for the state at issue.

they document and revisit later to measure their performance. Id. at 16. In 2004, Eli Lilly employers were rated either "Satisfactory" or "Needs to Develop" on seven leadership behaviors. In 2005 and 2006, employees were rated "Outstanding," "Successful," "Needs Improvement," or "Unsatisfactory." An employee's PM evaluation determined whether the employee was eligible for a merit pay increase the following year. Id. at 18-20. Of the seven leadership behaviors evaluated in Capp's 2004 PM review, Capp was rated "Satisfactory" in six areas and "Needs Improvement" in one area. As a result of this evaluation, Capp was eligible for and received a merit pay increase the following year. See Capp Dep., Ex. 18. Of the seven leadership behaviors evaluated in Capp's 2005 PM review, Capp was rated "Outstanding" in one area, "Successful" in five areas, and "Needs Improvement" in one area. Once again, as a result of his evaluation, Capp was eligible for and received a merit pay increase the following year. See Capp Dep., Ex. 19.

During the entire time Benson was Capp's supervisor, Benson visited Capp in person to review his performance and accompanied him on four or five occasions to visit customers. [Record Document 47, SOMF, ¶ 41]. Capp seldom had personal interaction with Assalley; their only personal visit occurred in July 2006 when Assalley and Capp visited one of Eli Lilly's customer's in Louisiana to discuss a contract proposal to secure access to Eli Lilly's products on state formularies, which Louisiana had previously rejected. Id. at ¶ 50.

On August 23, 2006, Capp sent a letter to Rebecca Marson, an Eli Lilly Human Resources Manager, in which he alleged that he had been subjected to age-based harassment and discrimination since November 2005, when he was assigned to the West Central Region under the management and direction of Benson and Assalley. See Capp

Dep., Ex. 13. Capp claimed Benson had harassed and discriminated against him because of his age by: (1) making public and private remarks about his age and retirement; (2) threatening he would lose his job if the Louisiana proposal did not get signed; (3) divulging private and confidential information about him and other employees; (4) deviating from company policies and procedures; (5) treating him differently than other employees; and (6) violating company guidelines on harassment. Id.

Senior Human Resources Representative Alison Franke was assigned to investigate Capp's allegations. [Record Document 47, SOMF, ¶ 56]. Franke began her investigation by asking Capp to provide any documents or information that supported his claims of age-based discrimination and harassment. In response, Capp submitted eight and one-half single-spaced pages of factual allegations, which include but are not limited to the following:

- At the B2B National Meeting in the Fall of 2005, Benson told Capp, "Jim you are losing money by not retiring."

- On November 3, 2005, Benson told Tracey Chatham that Capp could retire but was "still hanging in there."

- On November 17, 2005, Benson asked Capp when he was going to "hang it up," and then asked him to set up succession for when he retires.

- On December 14, 2005, Benson again asked Capp to set up his succession.

- Capp was not permitted to attend the quota trip in 2006 with the other account executives from the West Central Region.[2]

---

[2] See, infra at n.3.

- On April 21, 2006, on a state action team conference call, Benson told the team: "Whenever Jim decides to retire. We should set up a lottery on who will go first—Walt (Robinson) or Jim."

- In April 2006, when Capp asked what goals Benson wanted to set on his Developmental Action Plan ("DAP"), Benson replied, "whatever your career goals are at this stage of the game." Capp understood this statement to mean that Benson was disinterested in his career.

- In May 2006, at a national meeting in Dallas, Benson asked, "Does anyone remember the man that came up with the rules for basketball?" When Capp said "I think it was Abner," Butch interrupted and said, "Jim probably knew him," which resulted in laughter from others in the room.

- On the last day of the national meeting, after a general discussion, Benson told Capp: "You better get Louisiana or you might not make it to retirement."

- In June 2005, Capp told Benson he was proud that he had accomplished all the goals he had set for the first 6 months of the year. Benson said, "If they are written right you can do it every time." Capp understood Benson to be belittling his accomplishments.

- In July 2006, on a conference call for the Southeast District, Juan Pagan asked Benson to email his comments as Pagan was driving and could not remember all he was saying. Benson replied, "You and Jim Capp and your memory losses."

- In July 2006, Assalley asked Capp how many points he had for retirement.

- In August 2006, at a lunch with co-workers, Benson told Capp, "Damn Jim, can't you hear?"

- In August 2006, Benson told Capp, "Sometimes I wonder why you are here. The increases (pay) are not that great. There is plenty else you can do...too many opportunities like working for the state, etc." Benson told Capp he could make more money outside of Eli Lilly with his retirement and another job, and that there was no need in Capp putting up with all of the pressure. Capp felt Benson was encouraging him to retire.

- Benson informed Capp that he was under significant pressure from the top to do things he did not think were right, and that he had been protecting Capp but could not continue to do so.

- Benson was heard to say about Capp: "The old gray fox still has it."

- In July 2006, Dave Montgomery called Capp a "bottom feeder," and informed Capp that he, Capp, and Brian were on the "bottom of the list" and were on Assalley's "Hot Sheet."

- In August 2006, Benson assigned Capp unrealistic goals to meet, goals which purportedly affected Capp's ability to receive raises and/or bonuses.

See Capp Dep., Ex. 14. Capp alleged that Benson's repeated remarks concerning his age constituted harassment and discrimination, and that these remarks had begun to affect his physical and mental health. See Capp Dep., Ex. 13.

After reviewing Capp's allegations, Franke interviewed three account executives who reported to Benson and one account executive who did not report to Benson, all of whom Capp identified as witnesses. Franke also interviewed a member of Capp's state action team for Louisiana and an individual in Eli Lilly's management who was involved in the 2005 realignment. Id. at ¶ 60-61. In addition, Franke spoke with Benson's supervisor, Tom Assalley. On October 26, 2006, Franke and Assalley interviewed Benson about Capp's allegations. Id. at ¶ 62.

On or about October 6, 2006, while the investigation of Capp's complaint was ongoing, the territory of Mississippi was taken away from Capp and reassigned. Capp alleges this action affected his bonus opportunities and greatly reduced his job responsibilities. [Record Document 55, SOMF, p.7].

On October 25, 2006, two months after writing a letter to Human Resources outlining his complaints, Capp sent an email to Franke in which he expressed his

frustration with the length of time in which the investigation was taking, alleged that the hostile work environment he experienced before filing his complaint had been exacerbated, that he "no longer [had] confidence in Lilly's system," and that he was "compelled to announce [his] involuntary retirement effective December 31, 2006." See Capp Dep., Ex. 21. On October 31, 2006, Franke contacted Capp to inform him of the results of Eli Lilly's investigation into his complaint. Specifically, Frank informed Capp that her investigation revealed the following:

- Capp had not been subjected to any adverse employment action, nor had he received any critical performance-based coaching or discipline;

- Benson had not asked or instructed Capp to retire;

- Benson denied making derogatory statements about Capp's age and retirement;

- The witnesses identified by Capp either did not recall Benson making the derogatory statements or perceived the statements differently than Capp;

- The witnesses did not recall Benson threatening that Capp might not make it to retirement if he did not get the Louisiana proposal signed;

- Benson's discussions with Capp concerning succession had occurred in response to Capp sharing his retirement plans and Capp's interest in identifying individuals to succeed him;

- Benson did not encourage or ask Capp to retire;

- Benson had not ignored Capp's achievements; and

- Eli Lilly had not treated Capp differently than other account executives with respect to the quota trip,[3] his goals and expectations, or his PM review.

[Franke Affidavit, ¶ 7-8].

Franke stated that her investigation did not find evidence of age-based discrimination or hostile work environment, although she did find communication gaps and lapses in judgment, about which Eli Lilly would address Benson directly. Id. at ¶ 11. Franke addressed Capp's stated intent to retire and informed him that Eli Lilly did not want him to retire, that Eli Lilly was asking him not to retire, and that Eli Lilly considered him a valuable employee who had made significant contributions to Eli Lilly during his tenure that could continue for several years into the future. Id. Franke then provided Capp a letter detailing the conclusions of Eli Lilly's investigation.

On December 4, 2006, Benson completed Capp's 2006 PM review. Of the seven leadership behaviors evaluated, Benson determined that Capp's performance was "Outstanding" in two areas and "Successful" in five areas. See Capp Dep., Ex. 20. As a result of this evaluation, Capp was eligible for a merit pay increase, which he would have received the following year had he not retired on December 31, 2006. [Record Document 47, SOMF, ¶89, 91].

---

[3]Eli Lilly sponsors "quota trips" for account executives in regions that meet specified sales performance criteria. Before the 2005 realignment, Eli Lilly determined that an account executive whose former region met the quota trip criteria would be eligible to attend the trip with his post-realignment region (if that region was eligible for a trip). Id. at ¶ 27-28. If an account executive's former region had not met the quota trip criteria and was moved to a new region that had, then that account executive could not attend the quota trip. Id. at 29. The Midwest and South Central Regions met their quote trip criteria, but the Southwest region did not. Consequently, Capp and the other members of the former Southwest region were not permitted to attend the quota trip with their post-realignment regions. Id. at ¶ 36.

On February 5, 2007, Capp filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging he has been "harassed and treated differently" by Benson on the basis of his age and that he was constructively discharged.  See Record Document 1, Ex. A.  Capp received a Right to Sue letter on November 18, 2008.  See Record Document 1, Ex. B.  Thereafter, Capp filed a Complaint in the Western District of Louisiana against Eli Lilly asserting violations of the Age Discrimination in Employment Act ("ADEA").  Eli Lilly now moves for summary judgment in its favor on the grounds that Plaintiff's hostile work environment claim is not cognizable under the ADEA[4] and that Plaintiff has failed to demonstrate that he suffered an adverse employment action or that he was constructively discharged.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  A fact is "material" if it can "affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477

---

[4]Neither the Supreme Court nor the Fifth Circuit has ever held that the ADEA contemplates hostile work environment claims.  See Mitchell v. Snow, 326 Fed.Appx. 852, 854 n.2 (5th Cir. 2009) (citing McNealy v. Emerson Elec. Co., 121 Fed.Appx. 29, 34 n.1 (5th Cir. 2005).  Even assuming *arguendo* such claims are permitted, Capp's allegations of a hostile work environment in this case appear to be directly related to his claim of constructive discharge and will be addressed accordingly.  See infra.

U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). Facts that are irrelevant or unnecessary for determination of the suit should not be considered. Id. at 248-49, 106 S.Ct. 2510. A dispute over a material fact is "genuine" if the evidence is such that it could be resolved in favor of either party. Id.

If the party moving for summary judgment fails to satisfy its initial burden of demonstrating the absence of a genuine issue of material fact, the motion must be denied, regardless of the nonmovant's response. Little, 37 F.3d at 1075. If the motion is properly made, however, Rule 56(c) requires the nonmovant to go "beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." Wallace v. Texas Tech. Univ., 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted). While all factual controversies must be resolved in favor of the nonmovant, Cooper Tire & Rubber Co. v. Farese, 423 F.3d 446, 456 (5th Cir. 2005), the nonmovant's burden will not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. Little, 37 F.3d at 1075; Wallace, 80 F.3d at 1047.

Additionally, Local Rule 56.1 requires the moving party to file a statement of material facts as to which it contends there is no genuine issue to be tried. Pursuant to Local Rule 56.2, the party opposing the motion for summary judgment must set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried." All material facts set forth in the statement required to be served by the moving party "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." Local Rule 56.2.

Because employment discrimination claims "involve nebulous questions of motivation and intent," summary judgment is generally an inappropriate tool for resolving

these cases. Thornbrough v. Columbus & Greenville R.R. Co., 760 F.2d 633, 640-41 (5th Cir.1985) (citations omitted). However, if Plaintiff fails to establish a prima facie case, Bauer v. Albermarle Corp., 169 F.3d 962, 966 (5th Cir.1999), or if defendant presents strong evidence of a legitimate, nondiscriminatory reason for its actions and the plaintiff is unable to counter with additional evidence of pretext, summary judgment may be properly granted. Enplanar, Inc. v. Marsh, 11 F.3d 1284, 1295 (5th Cir.1994). With these principles in mind, we now turn to a review of the claims at issue.

## LAW AND ANALYSIS

The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff may prove age discrimination either through direct evidence or circumstantial evidence. Rachid v. Jack In The Box, Inc., 376 F.3d 305, 309 (5th Cir. 2004). When there is no direct evidence of discrimination, as in this case, a plaintiff's claims are evaluated using the evidentiary framework set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). Under the McDonnell Douglas framework, in order to survive a motion for summary judgment, the plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. Id. at 802, 93 S.Ct. at 1824. To establish a *prima facie* case of age discrimination, a plaintiff must show that (1) he is a member of the protected class; (2) he was qualified for the position; (3) he suffered an adverse employment decision; and (4) he was either i) replaced by someone outside the protected class, ii)

replaced by someone younger, or iii) otherwise discharged because of his age. See Smith v. City of Jackson, Miss., 351 F.3d 183, 196 (5th Cir. 2003), aff'd on other grounds, 544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410; Rachid, 376 F.3d at 309. Once established, the *prima facie* case raises a presumption of discrimination, which the defendant must rebut by articulating a legitimate, nondiscriminatory reason for its actions. Berquist v. Washington Mut. Bank, 500 F.3d 344, 349 (5th Cir. 2007), cert. denied, 128 S.Ct. 1124, 169 L.Ed.2d 950 (2008). If the defendant offers evidence of such a legitimate reason, the burden shifts back to the plaintiff to raise a genuine issue of material fact either that the proffered reasons are merely pretextual or that, while the preferred reasons are true, plaintiff's age was a motivating factor in the defendant's decision. Rachid, 376 F.3d at 312-13.

Eli Lilly contends Capp's claim must fail because there is no evidence demonstrating that he suffered an adverse employment action. In response, Capp argues that he was ranked in the bottom third of Eli Lilly's employees, that the territory of Mississippi was taken away from him on or about October 6, 2006, and that he was constructively discharged.[5]

The Fifth Circuit analyzes "the 'adverse employment action' element in a stricter sense than some other circuits." Burger v. Central Apartment Mgmt., Inc., 168 F.3d 875, 878 (5th Cir. 1999). "Adverse employment actions" include only those "ultimate

---

[5]Eli Lilly filed a Motion to Strike [Record Document 61] certain statements in the Declaration of James L. Capp, certain statements in Capp's Additional Material Facts as to Which There Exists a Genuine Issue to be Tried, and certain documents included in Capp's Appendix of evidentiary materials. However, even considering the statements and documents to which Eli Lilly objects, the Court finds that Capp cannot establish a genuine issue of material fact sufficient to overcome Eli Lilly's motion for summary judgment. Accordingly, it is unnecessary for the Court to examine the merits of Eli Lilly's motion to strike.

employment decisions such as hiring, granting leave, discharging, promoting, or compensating." Mitchell v. Snow, 326 Fed.Appx. 852, 854 (5th Cir. 2009) (quoting McCoy v. City of Shreveport, 492 F.3d 551, 559 (5th Cir. 2007)). A lower-than-expected job performance reviews does not in and of itself qualify as an "ultimate employment decision." See Mitchell, 326 Fed.Appx. at 854-55. Rather, there must be objective evidence connecting the performance evaluation to a loss in compensation, duties, or benefits. Pegram v. Honeywell, Inc., 361 F.3d 272, 283 (5th Cir. 2004) ("in cases where the evidence produces no objective showing of a loss in compensation, duties, or benefits,... that evidence is insufficient to establish an adverse employment action").

With respect to Capp's bottom-third ranking, he has failed to produce any evidence showing his low ranking resulted in a loss in compensation, job duties, or benefits. In fact, the evidence is to the contrary—Benson received positive performance evaluations in 2004, 2005, and 2006, and, as a result, was eligible for merit pay *increases*. See Capp Dep., Exs. 18-20. Furthermore, the document identified by Capp does not rank him in the bottom third of all Eli Lilly employees, but only in the bottom third of the nine account executives in Benson's district. See Record Document 55-3, App. 106. Capp's bottom-third ranking, in and of itself, simply does not qualify as an adverse employment action.

Conversely, Eli Lilly's decision to take Mississippi away from Capp in October 2006 appears, at first glance, to be an adverse employment action; however, this employment decision must be viewed in context. Capp admits that prior to November 1, 2005, he was responsible only for the state of Louisiana. See Capp. Decl. ¶ 5. He was not given responsibility for the state of Mississippi until after the realignment occurred in November 2005. Id. Eli Lilly concedes that Capp was no longer responsible for the territory of

Mississippi after October 2006, but states that this action occurred in the larger context of a broad reorganization in Eli Lilly's Public Health Division. See Record Document 60, p.5. During this reorganization, "the Public Health Division expanded from 34 to 46 account executives and restructured territories for eight of the 34 account executives who were employed in the Public Health Division prior to November 2006." [Assalley Aff. ¶ 6]. All eight account executives (including Capp) who had their territory restructured during this reorganization were assigned to smaller sales geographies. Id. at ¶ 7-8. With respect to Capp, the reorganization merely returned him to the same job responsibilities he held prior to the November 2005 realignment. Under these circumstances, the Court does not believe taking the territory of Mississippi away from Capp qualifies as an "adverse employment action." Moreover, the record lacks any objective evidence demonstrating that this action adversely affected his compensation, benefits, or job responsibilities, see Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (conclusory allegations and unsubstantiated assertions are insufficient to create a genuine issue of material fact), and lacks any evidence whatsoever indicating that Capp's age played a contributing factor in Eli Lilly's decision.[6]

---

[6] In addition, the Court notes that Capp's claim concerning the territory of Mississippi was never presented to Eli Lilly, was not included in his Charge of Discrimination submitted to the EEOC, was not included in his Complaint, and was not asserted during his deposition. Because Capp raises this claim for the first time in his Response to Eli Lilly's Motion for Summary Judgment, this claim cannot properly be considered by the Court. See Taylor v. Books-A-Million, Inc., 296 F.3d 376, 378-79 (5th Cir. 2002) (employment discrimination claims must exhaust administrative remedies before they may pursue claims in federal court); Thurman v. Sears, Roebuck & Co., 952 F.2d 128, 136-37 n.23 (5th Cir.), cert. denied, 506 U.S. 845, 113 S.Ct. 136, 121 L.Ed.2d 89 (1992) (a nonmovant cannot defeat a summary judgment motion by submitting an affidavit which contradicts, without explanations, the nonmovant's previous testimony in an attempt to establish a genuine issue of material fact).

To establish "constructive discharge," Capp must offer evidence that Eli Lilly deliberately made his working conditions so intolerable that a reasonable employee would feel compelled to resign. Stover v. Hattiesburg Public School Dist., 549 F.3d 985, 991 (5th Cir. 2008) (internal citations omitted); Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 310 (5th Cir. 1987). Whether a reasonable employee would feel compelled to resign depends on the facts of each case, but the court should consider the following actions relevant:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to a menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement that would make the employee worse off whether the offer was accepted or not.

Barrow v. New Orleans S.S. Ass'n, 10 F.3d 292, 297 (5th Cir. 1994). "Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge." Brown v. Kinney Shoe Corp., 237 F.3d 556, 566 (5th Cir. 2001), reh'g denied, 250 F.3d 745. The plaintiff "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Landgraf v. USI Film Products, 968 F.2d 427, 430 (5th Cir. 1992).

In support of his argument that he was constructively discharged, Capp again points to Eli Lilly's decision to take the territory of Mississippi away from him in 2006, and claims such action reduced his job responsibilities and bonus opportunities. See Record Document 55, p.12-13. But as previously discussed, there is no objective evidence indicating that this action actually reduced his compensation and/or bonus opportunities. Rather, the undisputed evidence shows that, even after he filed a grievance against

Benson, Capp continued to receive positive performance reviews and remained eligible for merit pay *increases*. See Capp Dep., Exs. 18-20. Eli Lilly's decision to merely return Capp to the same job responsibilities he performed prior to the 2005 realignment cannot be considered the type of "demotion" or "reduction in job responsibilities" sufficient to support a constructive discharge claim. See Brown v. Bunge Corp., 207 F.3d 776, 782 (5th Cir. 2000) (affirming summary judgment even where evidence demonstrated employee was demoted and given fewer job responsibilities).

Capp also argues he was badgered, harassed, and humiliated by Benson and Assalley, and that their actions were calculated to encourage his resignation and constituted offers of retirement. See supra (summary of statements and actions that Capp claims were discriminatory and/or harassing). Once again, Capp offers little more than his conclusory allegations and unsubstantiated assertions to support his claim. Even accepting his allegations as true, however, an independent review of the alleged harassment fails to demonstrate that Capp was subjected to a hostile work environment, much less that his "working conditions were so intolerable that a reasonable employee would feel compelled to resign." See Stover v. Hattiesburg Public School Dist., 549 F.3d 985, 991 (5th Cir. 2008). Indeed, the Fifth Circuit has found that conduct far more egregious than the conduct complained of in this matter was insufficient to establish constructive discharge. See Stover, 549 F.3d 985 (employee's assertions that she was not provided the same career development opportunities, her complaints of discrimination were not investigated, her supervisor exhibited anger and violence, and that she was excluded from prestigious retreats were not sufficient to support a claim of constructive discharge); Harvill v. Westward Communications, L.L.C., 433 F.3d 428, 440 (5th Cir. 2005)

(employee's conclusory assertions that she was treated "rudely and with general hatefulness," that a man she did not know began taking pictures of her, that a meritless racial harassment charge was brought against her, and that a new supervisor was overheard to state that he would receive a bonus if he ran her off were not sufficient to demonstrate "harassment so intolerable that a reasonable employee would feel compelled to resign); Brown v. Bunge Corp., 207 F.3d 776, 782-83 (5th Cir. 2000) (affirming summary judgment in case where supervisor's actions may have been insensitive, but there was no objective evidence of an intent to badger, harass or humiliate the employee); Vaughan v. Pool Offshore Co., 683 F.2d 922, 926 (5th Cir. 1982) (black employee was not constructively discharged on the basis of pranks, tricks, heavy-handed humor and crude racial language). While Benson's comments about Capp's age may have been inappropriate, disrespectful, and offensive to Capp based on his sensitivities, the "harassment" simply does not rise to the level of severity or pervasiveness necessary to establish constructive discharge.

The Court also finds it significant that Capp does not dispute the various favorable statements and actions that Benson and Assalley made toward Capp:

- Following a June 2006 visit, Benson rated Capp as "Good" in every performance category and made several positive comments about Capp's performance, stating Capp "continue[s] to model the values and work[s] to meet customers needs;"

- After Assalley went to work with Capp in July 2006 to visit discuss a contract proposal with a customer, Assalley sent Capp an email that complimented Capp on his job performance: "Your credibility and rapport with important customers was very evident;" "Your approach to building local support, through targeted interventions, makes a great deal of sense;" "Nice work on Strattera in MS;"

- In October 2006, Assalley sent Capp a letter of appreciation and congratulated Capp on his accomplishments in Mississippi;

- Prior to his retirement, Capp received the Lilly Diamond Award, which was given to one person in each Public Health Division region for exceptional performance and achievements, for his achievement in securing Zyprexa on formulary in Mississippi;

- Assalley sent Capp a Cross pen as a recognition for winning the Diamond Award and enclosed a complimentary letter stating that he "always admired how [Capp] modeled the Lilly values;"

- In November 2006, Benson emailed Capp to congratulate him for achieving his sales goals and told Capp "We will miss you next year;"

- Before Capp retired, Benson expressed to Capp that he did not want him to retire and would love to see him stay with Lilly.

[Record Document 47, SOMF, ¶ 48, 52, 80-83, 91; Capp Dep., Exs. 7, 11, 16].

The Fifth Circuit has stated that "[p]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast." Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 310 (5th Cir. 1987) (quoting Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987)) (emphasis in original). It was reasonable for Capp to file a grievance with the Human Resources Department and complain of Benson's inappropriate age-based remarks. A reasonable employee would have then given Eli Lilly a fair opportunity to complete its active investigation, provide "strong documented coaching" for Benson, and to otherwise demonstrate that it could curb Benson's conduct. A reasonable employee would not, however, have been compelled to submit his involuntary retirement in the midst of an ongoing investigation when he had suffered no adverse employment actions.

**CONCLUSION**

Because Court finds there are no genuine issues of material fact as to whether Capp suffered an adverse employment action, an essential element of his age discrimination claim, Eli Lilly's motion for summary judgment [Record Document 47] shall be granted and Plaintiff's claims shall be dismissed with prejudice.

A judgment consistent with this memorandum ruling shall issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, on this 28th day of January, 2010.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE